UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| VELMA JOYCE BOLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:07CV0049 AGF |
| | ) | |
| PROGRESSIVE NORTHWESTERN | ) | |
| INSURANCE COMPANY and STATE | ) | |
| FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER
### *NUNC PRO TUNC*[1]

This diversity case involving underinsured motorist ("UIM") coverage is before

the Court[2] on the motion of Defendant State Farm Mutual Automobile Insurance Co.

("State Farm") for summary judgment. For the reasons set forth below, the motion for

summary judgment shall be granted.

## BACKGROUND

Plaintiff Velma Joyce Bolin filed this action in state court against State Farm and

Progressive Northwestern Insurance Co. ("Progressive"), alleging breach of insurance

contracts and seeking payment under the UIM coverage provisions contained in policies

---

[1]    The Court enters this Memorandum and Order, *nunc pro tunc* as of April 7,
2009, to correct an error appearing on page 8 of the original Memorandum and Order
filed that date.  See Memorandum, Doc. #47.

[2]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

issued by Defendants.  The action was removed to this Court based on diversity of citizenship.  Plaintiff is the surviving parent of Michael Bolin ("Decedent") who was killed in a motor vehicle accident on March 11, 2006.  At the time of the accident, Decedent, then 35 years old, was driving a motorcycle owned by Paula Wilson ("Wilson"), his fiancé, who was also killed in the accident.  Progressive insured the motorcycle, with Wilson as named insured and Decedent as a named driver/household resident.  The accident occurred when a car driven by Geoffrey Hambric ("Hambric") struck the motorcycle.  Hambric's vehicle was insured by Mississippi Farm Bureau Insurance Company ("Mississippi Farm") for bodily injury liability with a limit of $300,000 per person and $500,000 per accident.  It is undisputed for purposes of the present motion, that Plaintiff's damages were over $500,000, and that Hambric's negligence caused the accident.

Although not discussed by either party, the record contains a letter dated June 27, 2007, in which Plaintiff's counsel informed State Farm of the accident and of Plaintiff's position that Decedent was a resident of her household at the time of the accident and thus an insured under three policies issued by State Farm.  The letter further advised State Farm that Mississippi Farm had tendered its full policy limits of $500,000 to settle the claims against Hambric for the deaths of Wilson and Decedent at $250,000 each.  Counsel asked for State Farm's written consent to such a settlement, adding that counsel intended to accept the settlement unless State Farm explained how it might be prejudiced thereby.  (Doc. #32-3 at 36-37.)

On August 31, 2007, Plaintiff and Decedent's sister entered into a release and

settlement agreement, as releasors, with Hambric, Mississippi Farm, and other parties, as releasees, pursuant to which Mississippi Farm paid the releasors a total of $250,000 ($125,000 each) in exchange for a release from all further claims connected to the accident. (Doc. #25-3.) The agreement stated that any claims Plaintiff might have against Progressive, State Farm, or any other insurance company providing UIM coverage for Decedent's death were excepted from the release. It is undisputed that a similar agreement for $250,000 was entered into with Wilson's heirs/estate, such that the estates of the two Decedents together obtained the full policy limit of Hambric's coverage.

Thereafter, Plaintiff demanded payment from Progressive for $50,000 in UIM coverage provided for in its policy insuring the motorcycle, and from State Farm under the UIM coverage provided in three policies issued by State Farm to Plaintiff. The demands were refused and this action ensued against Progressive (Count I) and State Farm (Count II) for the payment of benefits under the UIM coverage provisions in each policy. By Memorandum and Order dated December 8, 2008, this Court granted Progressive's motion for summary judgment as to Count I. The Court concluded that Hambric's vehicle did not qualify as an underinsured vehicle as defined in Progressive's policy, because Mississippi Farm's liability coverage was for amounts greater than the limit for Progressive's UIM coverage. Further, the settlement of $250,000 from Mississippi Farm exceeded the limits of Progressive's UIM coverage, and thus, no further benefits from Progressive were owed to Plaintiff. The present motion involves only Count II, asserted against State Farm.

**The Policies**

The record indicates that State Farm was Plaintiff's automobile liability insurer from at least 1998.[3] By letter dated March 27, 1998, from State Farm to Plaintiff, State Farm requested that a restriction on the driving of Decedent be placed on two policies issued by State farm, one on a 1988 Chevrolet (policy number 553 0608-CO8-25B) and one on a 1988 Chrysler (policy number 547 2171-A18-25A), due to Decedent's poor driving record in 1996 and 1997. (Doc. #32-8.) On April 3, 1998, Plaintiff signed a Driver Exclusion Agreement/Endorsement, amending her policies such that State Farm would not be liable for bodily injury, loss, or damage (except for liability coverage) while any motor vehicle was operated by Decedent. Plaintiff further agreed to include the endorsement "in any subsequent transfer, reinstatement or renewal of" the policies. Id.

Three State Farm policies issued to Plaintiff were in effect on March 11, 2006, the date of Decedent's fatal accident: Policy Number 547 2171-A18-25D for a 1988 Chrysler Lebaron, with a policy period of January 9 to July 18, 2006; Policy Number 553 0608-C08-25G for a 1996 Chevrolet Astro Van, with a policy period of March 6 to September 8, 2006; and Policy Number 89 5245-EO9-25A for a 2001 Jeep Grand Cherokee, with a policy period of February 13, 2006 to May 9, 2006. (Doc. #32-9, 32-10, & 32-11). Pursuant to the Limits of Liability set forth in the Declarations section of each policy, the policies provided UIM coverage in the amount of $50,000 per person/$100,000 per accident. The policies open with a general definition section, stating that defined words

_____

[3]     The policies also named as an insured, Michael McCann, Plaintiff's significant other with whom she lived at all relevant times.

are printed in boldface italics throughout the policies. "**Car**" is defined as "a land motor vehicle with four or more wheels, which is designed for use mainly on public roads." "**Relative**" is defined, per an endorsement to the policies, as "a **person** related to **you** or **your spouse** by blood, marriage or adoption who resides primarily with **you.** It includes **your** unmarried and unemancipated child away in school." The words "resides" and "primarily" are not defined in the policies.

The policies provided for UIM coverage (SECTION III - COVERAGE W), as follows:

> We will pay damages for **bodily injury** an **insured** is legally entitled to collect from the owner or driver of an **underinsured motor vehicle**. The **bodily injury** must be sustained by an **insured** and caused by an accident arising out of the operation, maintenance or use of an **underinsured** motor vehicle.

*   *   *

> **Underinsured Motor Vehicle** – means a land motor vehicle:
>
> 1. the ownership, maintenance or use of which is insured or bonded for bodily injury liability at the time of the accident; and
>
> 2. whose limits of liability for bodily injury liability:
>
>    a. are less than the amount of the **insured's** damages; or
>
>    b. have been reduced by payments to **persons** other than the insured to less than the amount of the **insured's** damages.

*   *   *

**Who Is an Insured**

***Insured*** – means the ***person*** or ***persons*** covered by uninsured motor vehicle or underinsured motor vehicle coverage.

**This is:**

1. the first ***person*** named in the declarations;

2. his or her ***spouse;***

3. their ***relatives;*** and

4. any other ***person*** while ***occupying:***

   a. ***your car***, a ***temporary substitute car***, a ***newly acquired car*** or a trailer attached to such car.

   Such vehicle has to be used within the scope of the consent of ***you*** or your spouse; or

   b. a ***car*** not owned or leased by ***you, your spouse***, or any ***relative***, or a trailer attached to such a ***car.*** It has to be driven by the first ***person*** named in the declarations or that ***person's spouse*** and within the scope of the owner's consent.

5. any ***person*** entitled to recover damages because of ***bodily injury*** to an ***insured*** under 1 through 4 above.

\*    \*    \*

**If There Is Other Underinsured Motor Vehicle Coverage**

\*    \*    \*

3. If the ***insured*** sustains ***bodily injury*** while ***occupying*** a vehicle not owned or leased by ***you, your spouse*** or any ***relative***, this coverage applies:

   a. as excess to any underinsured motor vehicle coverage

which applies to the vehicle as primary coverage, but

b.    only in the amount by which it exceeds the primary
      coverage.

If coverage under more than one policy applies as excess:

a.    the total limit of liability shall not exceed the
      difference between the limit of liability of the coverage
      that applies as primary and the highest limit of liability
      of any one of the coverages that apply as excess; and

b.    we are liable only for our share.  Our share is the per
      cent of the damages that the limit of liability of this
      coverage bears to the total of all underinsured motor
      vehicle coverage applicable as excess to the accident.

                          *    *    *

Two other provisions of the policies are relevant.  First, under the heading,

**"REPORTING A CLAIM - INSURED'S DUTIES**," they provided:  "The insured must

give us or one of our agents written notice of the accident or loss as soon as reasonably

possible."  Second, under the heading "**When Coverages U and W Do Not Apply,**" they

stated,

1.    "THERE IS NO COVERAGE UNDER [THE UIM COVERAGE
      SECTION] FOR ANY *INSURED* WHO, WITHOUT OUR WRITTEN
      CONSENT, SETTLES WITH ANY *PERSON* OR ORGANIZATION
      WHO MAY BE LIABLE FOR THE *BODILY INJURY* AND
      THEREBY IMPAIRS OUR RIGHT TO RECOVER OUR
      PAYMENTS."

**Evidence Related to Decedent's Primary Residence**

With regard to Decedent's residence at the time of the accident, Plaintiff's

November 13, 2006 deposition testimony (Doc. #36-1), and her affidavit dated January

16, 2009 (Doc. #36-2), show the following:

At all relevant times, Plaintiff resided at 16046 Monroe Road in Madison, Missouri. From approximately 1990 until 2000, Decedent lived with his then-girlfriend, Edwina Blackburn, at various residences, none of which included Plaintiff's home. Plaintiff testified in her deposition that after Decedent and Blackburn broke up in 2000, Decedent moved back into Plaintiff's house. In her affidavit, Plaintiff attested that when Decedent moved back into her house, he brought with him "his furniture, clothing, toiletries, collections and other personal effects."

Plaintiff testified further that at the time, Decedent was working for Bross Construction Company and slept in motels or other temporary places near the construction sites to which he was sent in Southern Missouri. Plaintiff testified that she did not know how often Decedent slept in her house during this period, which lasted until 2005 when he went to Mississippi, although she recalled a one-week period during which he was working on a road nearby and slept at the house every night.

On July 30, 2001, Decedent executed a Form W-4 showing Bross Construction Company as his employer and identifying his home address as 17269 Monroe Road 709, Paris, Missouri. In June 2005, Decedent and Wilson formed a business called Bolin Concrete and More, the address of which was not Plaintiff's home. In September 2005, Decedent went to Mississippi to work for FEMA in connection with Hurricane Katrina clean-up. He first lived in Hattiesburg, Mississippi, for about one week, and then in Seminary, Mississippi, in a FEMA campground where he lived until his death. Plaintiff testified that during this time, Decedent kept clothing, toiletries, and his beer can collection at her house. In her affidavit, Plaintiff attested that "[o]ther than clothing and

personal items he would need while working in Mississippi," Decedent kept at her house the items he brought with him in 2000.

Plaintiff testified that she did not know how often Decedent stayed at her house during the 12 months that preceded his death, or approximately what percentage of that time he stayed at her house. She acknowledged that the only time he was physically present at her house between September 2005 and the accident of March 11, 2006, was for one week during Christmas, when he came with Wilson and introduced her as his fiancé.

The Progressive policy covering Wilson's motorcycle showed Wilson's address as 216 County Highway 409, Hayti, Missouri, and listed Wilson (named insured) and Decedent as "Drivers and household residents." (Doc. #8-4.) When Decedent and Wilson registered a truck on May 3, 2005, with the Missouri Department of Revenue, they listed their place of residence as Hayti, Missouri. Decedent purchased two dump trailers on September 22, 2005, with the receipts listing Decedent's place of residence in Hayti, Missouri. On January 17, 2006, Decedent and Wilson created a joint bank account at a bank in Columbia, Mississippi, and as of March 11, 2006, they operated a joint bank account at a bank in Caruthersville, Missouri, which is about ten miles from Hayti. On the crash report following the accident, the State of Mississippi listed Decedent's address as 1070 Route YY, Moberly, Missouri. (Doc. #32-3 at 41.) On Decedent's death certificate issued by Mississippi, his place of residence is shown as Plaintiff's house. (Doc. #32-3 at 38.)

Plaintiff attested in her affidavit that from 2000 Plaintiff resided at her home and

received his mail there.  In support of this statement she submitted copies of five items of mail that were sent to Decedent at Plaintiff's address: a letter from the Missouri Attorney General dated February 8, 2008, regarding Missouri's No Call List; a letter from a credit union dated October 31, 2005, regarding Decedent's pickup truck; an undated envelope from an insurance agency; a cellular telephone bill dated April 10, 2006; and a loan and security disclosure statement from a credit union dated October 4, 2005.  (Doc. #36-3.)

## ARGUMENTS OF THE PARTIES

In support of its motion for summary judgment, State Farm first argues that the Decedent did not meet the definition of an insured under the policies.  State Farm argues that the term "relative" as defined in the policies -- "a person related to you . . .  who resides primarily with you" -- is clear and unambiguous and that the undisputed evidence shows that at the time of the accident, Decedent did not reside primarily with Plaintiff, but rather resided primarily with Wilson.  State Farm argues additionally that Decedent was not an insured due to the 1998 exclusion agreement.  State Farm has submitted an affidavit of one of its auto underwriting team managers who attests that as of February 15, 2000, Decedent was noted by State Farm as living in Perry, Missouri, that as a result, the exclusion was removed from Plaintiff's policies as Decedent was no longer a part of her household, and that had State Farm been informed that Decedent moved back to live with Plaintiff, the exclusion would have been re-instituted.  (Doc. #39-2.)

State Farm next argues that Plaintiff is not entitled to UIM coverage because Wilson's motorcycle operated by Decedent at the time of the accident did not satisfy the definition of a "car" for purposes of UIM coverage.  State Farm also contends that it is

entitled to summary judgment even if Decedent were an insured, because Plaintiff's UIM coverage did not exceed the coverage afforded Plaintiff under the Progressive policy.

State Farm argues additionally that it is entitled to summary judgment because Plaintiff caused prejudicial delay by not providing State Farm written notice of the accident until 15 months after its occurrence, and further, that by entering into a settlement agreement with Hambric without State Farm's consent, Plaintiff forfeited her right to any UIM coverage under the State Farm policies. Lastly, State Farm argues that the policies' clear and unambiguous language prohibits Plaintiff from stacking the policies' UIM coverage,[4] such that even if all of State Farm's arguments for summary judgment failed, the total limit of State Farm's liability cannot exceed the highest limit of liability of any one of the State Farm policies, or a total of $50,000.

In opposition to the motion for summary judgment, Plaintiff argues that the policy definition of "relative" is ambiguous, and thus must be interpreted in Plaintiff's favor, and that, viewing the facts in the light most favorable to Plaintiff, a factfinder could reasonably determine that Decedent primarily resided with Plaintiff at the time of the accident. Plaintiff argues that the 1998 exclusion agreement did not exclude Decedent from the State Farm policies in effect at the time of the accident, but rather pertained only to those policies in existence in 1998. Plaintiff argues that it is irrelevant whether a motorcycle is

---

[4]    "Stacking" refers to an insured's ability to obtain multiple insurance coverage benefits for an injury from more than one policy, e.g., separate policies from the same insurer on separate vehicles. <u>Bauer v. Farmers Ins. Co.</u>, 270 S.W.3d 491, 493 n.1 (Mo. Ct. App. 2008.)

a "car" as defined in the policies' general definition section of the policies, because the word "car" is not used in the relevant UIM provisions.

Plaintiff next asserts that because this Court determined that there was no UIM coverage under Progressive's policy, State Farm's argument that its coverage is excess over Progressive's policy is irrelevant. With respect to State Farm's argument based upon the 15-month delay in Plaintiff notifying State Farm of the accident, Plaintiff argues that the delay did not cause State Farm any prejudice, and notes that she filed her UIM action well within the ten-year statute of limitations. She also asserts that there was no prejudice to State Farm due to Plaintiff's failure to get State Farm's consent to the settlement agreement, as Hambric's full policy limits were obtained. Lastly, Plaintiff counters State Farm's anti-stacking argument by asserting that as an exclusion to coverage, the anti-stacking provision in the polices should be construed narrowly.

## DISCUSSION

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); First S. Ins. Co. v. Jim Lynch Enter., Inc., 932 F.2d 717, 718 (8th Cir. 1991). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. United Fire & Cas. Co. v. Gravette, 182 F.3d 649, 654 (8th Cir. 1999).

As the parties acknowledge, Missouri law applies to this case. The task of a federal court sitting in diversity is to attempt to predict how the forum state's highest court would resolve the issues. Allstate Ins. Co. v. Blount, 491 F.3d 903, 908 (8th Cir. 2007). Under

Missouri law, the insured has the burden of proving coverage.  <u>Am. Family Mut. Ins. Co.</u>

<u>v. Co Fat Le</u>, 439 F.3d 436, 439 (8th Cir. 2006).

**<u>Where did Decedent "Reside Primarily"?</u>**

As noted above, State Farm argues that the term "relative," as defined in the

policies as a person who resided primarily with a named insured, is clear and

unambiguous and that the undisputed evidence shows as a matter of law that at the time of

the accident on March 11, 2006, Decedent did not reside primarily with Plaintiff, but

rather resided primarily elsewhere, with Wilson.  The Court agrees.

Under Missouri law,

> [w]hether or not the language of an insurance policy is ambiguous is a
> question of law.  An ambiguity exists when there is duplicity, indistinctness
> or uncertainty in the meaning of the language used in the policy.  If the
> language of the policy is ambiguous and reasonably open to different
> constructions then the language will be interpreted in the manner that would
> ordinarily be understood by the lay person who bought and paid for the
> policy.

<u>Pruitt v. Farmers Ins. Co.</u>, 950 S.W.2d 659, 664 (Mo. Ct. App. 1997) (citations omitted);

<u>see also</u> <u>Chamness v. Am. Family Mut. Ins. Co.</u>, 226 S.W.3d 199, 202 (Mo. Ct. App.

2007).  If an ambiguity exists in an insurance policy, it is construed against the insurer

because insurance is designed to furnish, not defeat, protection to the insured and the

insurance company is in the best position to remove ambiguity from a contract.  <u>Tapley v.</u>

<u>Shelter Ins. Co.</u>, 91 S.W.3d 755, 757 (Mo. Ct. App. 2002).  Missouri courts are guided by

the general principle that "[i]nsurance contracts are designed to furnish protection; as a

result, where possible, we will interpret them to grant coverage rather than defeat it."

Bowan ex rel. Bowan v. Gen. Sec. Indem. Co. of Ariz., 174 S.W.3d 1, 5 (Mo. Ct. App. 2005).

A court is not permitted, however, to create an ambiguity in order to distort the language of an unambiguous policy, or enforce a particular construction which it might feel is more appropriate. Rodriguez v. Gen. Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo. banc 1991). "Absent an ambiguity, an insurance policy must be enforced according to its terms." Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. banc 2007) (citing Rodriguez, 808 S.W.2d at 382).

Missouri courts have acknowledged the possibility that a person may be a "resident" of more than one place for purposes of insurance coverage. See Countryside Cas. Co. v. McCormick, 722 S.W.2d 655, 659 (Mo. Ct. App. 1987). There the court considered whether a child, living with her mother, was covered, as a "relative," under the uninsured motorist coverage of her father's policy. The policy defined "relative" as "a person related to the named insured . . . by blood . . . and who is a resident of and actually living in the same household as the named insured[.]" Id. at 656. The court held that the child was "a resident of, and 'actually living in,' two separate households," her mother's and her father's. Id. at 659. In reaching that conclusion, the court stated, "The policy did not require that [the father's] residence be [the child's] 'sole' residence, or even her 'principal' residence or her residence 'most of the time.'" Id.; see also Pruitt, 950 S.W.2d at 663.

In Pruitt, the court quoted with approval from Black's Law Dictionary 1309 (6th ed. 1990) as explaining that "domicile" and "residence" are not identical terms, for a

person may have two places of residence, but only one domicile. "Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place . . . ." 950 S.W.2d at 663.

This Court recognizes that Missouri courts have noted that the question of whether a person is a resident of a particular household in the present context is one of fact, and that words like "reside," and "resident" are flexible and relative, often making summary judgment inappropriate. See Pruitt, 950 S.W.2d at 663-65 (citing cases); Clarkson v. MFA Mut. Ins. Co., 413 S.W.2d 10, 15 (Mo. Ct. App. 1967).

While a person may reside in two places for purposes of insurance coverage, a person cannot reside "primarily" in two places. Here, viewing the underlying facts in the light most favorable to Plaintiff, the Court concludes that no reasonable factfinder could find that at the time of the accident, Decedent resided primarily with Plaintiff. To the extent any Missouri residence was indicated, Decedent's bank records, vehicle registration records, and other documents all show residence in Southern Missouri, in or around Hayti, Missouri. The fact that he kept some personal belongings at Plaintiff's home and received some mail there does not change the fact that since at least September 2005, he was not physically present there except for one week during Christmas. Nor could Plaintiff say how often or what percentage of the time he slept at her home in the 12 months preceding the accident. Thus, State Farm's motion for summary judgment shall be granted. See Elder v. Metro. Prop. & Cas. Co., 851 S.W.2d 557 (Mo. Ct. App. 1993) (holding as a matter of law on summary judgment that under the facts of the case, 22-year-old passenger

was not resident of his insured father's household and was thus not a "relative" under father's uninsured motorist policy, and, therefore, was not entitled to benefits); McCance v. Farmers Ins. Co., 783 S.W.2d 467, 469 (Mo. Ct. App. 1990) (affirming summary judgment in favor of uninsured motorist insurer where facts established that insured's 18-year-old daughter resided in a house trailer with a friend for two and one-half months prior to accident, and was thus not a relative who resided in the same household of the insured, as required for coverage).

The cases relied upon by Plaintiff in opposition to State Farm's motion for summary judgment present factual scenarios and evidence quite different from the present case. For example, in Pruitt, 950 S.W.2d at 663-65, the Missouri Court of Appeals held that in determining whether the named insureds' nephew who was spending the summer with them, was a resident of their household and thus insured under their automobile insurance policies, it was appropriate to consider that he was an integrated part of their household, ate meals with the named insureds' family, was required to seek their permission for activities and was subject to their discipline, left his clothes to be washed with those of named insureds' family members, received extra spending money from named insureds, and was generally treated as a member of their family. And in Miller v. Secura Ins. & Mut. Co. of Wisc., 53 S.W.3d 152 (Mo. Ct. App. 2001), the court held that the evidence was sufficient to support a finding that a driver involved in an accident was "a person living in [his insured father's] household," at the time of the accident and thus was covered under his father's insurance policy, where even though during the year or two prior to the accident, the driver stayed a substantial number of nights at the residence of

his girlfriend, he spent days and nights through that entire period in his father's home; a bedroom was maintained in his father's home for his use; he kept the bulk of his clothing there, taking only what he needed when he stayed over with his girlfriend; he also kept his sporting goods and his boat at his father's house and received his mail there; the address on his driver's license was his father's home; and he did his laundry, mowed the grass and did yard work there.  Based on this evidence, the court concluded that the driver was an insured person under the terms of the insurance policy because he had not abandoned his previously established residence in his father's home on the day of the accident.  53 S.W.3d at 158.

These cases are inapposite because the court in these cases was not called upon to consider where the individual in question resided <u>primarily</u> at the relevant time. Moreover, in each of these cases there was strong evidence and varied evidence that the individual lived at the locale in question, which is not the case here.  Although Plaintiff attested that Decedent resided at her home from 2000, this conclusory statement does not present a jury question on whether her home was where he resided primarily at the time of the accident.  In sum, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable factfinder could conclude that Decedent resided primarily with Plaintiff at the time of the accident.

Although it is not necessary to do so, the Court will nonetheless briefly address the parties' remaining arguments.

**Policy Definition of "Car"**

State Farm argues that Decedent was not covered by the UIM provisions in the

policies for the additional reason that Wilson's motorcycle did not meet the policies' definition of "car." As Plaintiff posits, this argument is irrelevant because Plaintiff is not seeking coverage for Decedent as a person occupying Plaintiff's car, temporary substitute car, or newly acquired car (definition 4 of who is insured for UIM coverage), but rather is seeking coverage for Decedent as a relative (definition 3), and the word "car" does not appear in the relevant portions of the policies.[5]

## The 1998 Exclusion

The Court likewise rejects State Farm's argument that it is entitled to judgment as a matter of law based on the 1998 exclusion agreement. Viewing the facts and all reasonable inferences in Plaintiff's favor, the Court cannot find as a matter of law that the 1998 exclusion would necessarily apply the moment, if ever, that Decedent returned to Plaintiff's home. State Farm certainly can point to no language in the policies requiring same. Construing the facts and policies in Plaintiff's favor, it would appear that State Farm was free to bargain for such an exclusion in subsequent policies it issued to Plaintiff, especially on other vehicles than those insured by State Farm 1998, but it did not do so.

## Notice of the Accident

State Farm argues that it is entitled to summary judgment because Plaintiff caused prejudicial delay by not providing State Farm written notice of the accident until 15 months after its occurrence. The only prejudice alleged by State Farm is that it was "prevented from gathering evidence, including finding witnesses and investigating whether

---

[5]    The Court notes that State Farm did not pursue this argument in its reply brief.

or not the decedent had reestablished his residency with the named insured." (Def. Memo at 18-19.) Plaintiff asserts that State Farm has failed to meet its burden of showing prejudice from the delay, in that State Farm has provided no names of witnesses that have been unavailable nor specified any further investigation it would find necessary to the case. Plaintiff points out that she filed this action well within the ten-year statute of limitations.

Under Missouri law,

[a] showing of untimely notice [by an insured] is not enough; the insurer must also prove that it was prejudiced by that late notice. Missouri has long placed the burden of showing prejudice on the insurer. The prejudice requirement stems from the reluctance of Missouri courts to excuse an insurer from its contractual obligations because of an insured's breach of a policy provision that does not prejudice the insured. The presence or absence of prejudice is a fact-specific inquiry to be determined by the trier of fact.

Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co., 229 S.W.3d 138, 148 (Mo. Ct. App. 2007) (internal citations and quotation marks omitted). Here, State Farm has not established that it would be entitled to summary judgment on this ground; rather a jury question is presented on whether State Farm was prejudiced by the timing of Plaintiff's notice to State Farm of Decedent's accident.

**Failure to Obtain Consent to Settle**

As noted above, the State Farm policies provided: "There is no coverage under [the UIM coverage section] for any insured who, without our written consent, settles with any person or organization who may be liable for the bodily injury and thereby impairs our right to recover our payments." State Farm argues that it is entitled to summary judgment

in light of the undisputed fact that Plaintiff settled with Hambric without State Farm's consent. Plaintiff argues that it was unnecessary to obtain consent from State Farm to enter into the settlement agreement with Hambric because Hambric's full policy limits were obtained.

"'Right to consent' clauses [in insurance policies] are designed to prevent the insured from entering into a settlement agreement which will impair the insurer's right to subrogation. Generally, these clauses will be upheld 'unless consent is unreasonably withheld.'" Mazzocchio v. Pohlman, 861 S.W.2d 208, 211 (Mo. Ct. App. 1993) (quoting Tegtmeyer v. Snellen, 791 S.W.2d 737, 740 (Mo. Ct. App. 1990)). An exception to this rule is recognized where the insured settles with the tortfeasor for the full policy amount of the tortfeasor's insurance. Id. Plaintiff invokes this exception. However, while Hambric's insurer did pay the full policy limits of its policy, Plaintiff obtained only half of that amount. Thus the Court believes that State Farm's argument on this matter is well taken, and that State Farm would be entitled to judgment on this ground, as well.

**Stacking**

Lastly, State Farm argues that the policies' clear and unambiguous language prohibits Plaintiff from stacking the policies' UIM coverage, such that even if State Farm's arguments for summary judgment failed, the total limit of State Farm's liability would be $50,000, i.e., the highest limit of liability of any one of the State Farm policies. Plaintiff asserts that as an exclusion to coverage, the anti-stacking provisions in the polices should be construed narrowly.

If ambiguity exists between different sub-paragraphs of an anti-stacking provision

of a UIM section of a policy, or between that provision and another section of the policy, Missouri courts will resolve the ambiguity in favor of the insured and will not enforce the anti-stacking provision. <u>Ritchie v. Allied Prop.& Cas. Ins. Co.</u>, ___ S.W.3d ___ , No. SD 28902, 2009 WL 596657, at *4-5 (Mo. Ct. App. Mar. 10, 2009).

Although Missouri courts are inclined to find some ambiguity in anti-stacking provisions, resulting in their non-enforceability, <u>see</u> <u>id.</u>, this Court believes that here, the Missouri Supreme Court would find that the section in the policies entitled "If There is Other Underinsured Motor Vehicle Coverage" clearly explains that stacking of UIM benefits in multiple policies issued by State Farm pertaining to different vehicles owned by the named insured was precluded when an insured was injured while occupying a vehicle not owned by the insured. Plaintiff has not identified, nor does this Court discern any other section in the policies that would create an ambiguity as to this anti-stacking provision. The Court notes that under Missouri law, UIM (unlike uninsured motorist coverage) is not statutorily required, and the parties were thus free to negotiate the parameters of such coverage. Thus, the Court finds that if there were coverage, it would be limited to $50,000 by the anti-stacking provisions.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED**, *nunc pro tunc* as of April 7, 2009, that State Farm Mutual Automobile Insurance Co.'s motion for summary judgment is **GRANTED**. [Doc. #31]

**IT IS FURTHER ORDERED** that all other pending motions are **DENIED** as moot, and that the trial setting in this case is **VACATED**.

All claims, against all parties having been resolved, a separate Judgement shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of April, 2009.